IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| STEPHEN BISHOP, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 04-1076-KI |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| KARIN ZEH, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Stephen Bishop #43064
P. O. Box 4000
Florence, Arizona  85232

     Pro Se Plaintiff

Hardy Myers
Attorney General
Jacqueline Sadker
Assistant Attorney General
Department of Justice
1162 Court Street, N.E.
Salem, Oregon  97301-4096

-and-

Page 1 - OPINION AND ORDER

      Douglas R. Andres
      John M. Kreutzer
      Bullivant Houser Bailey, P.C.
      300 Pioneer Tower
      888 S.W. Fifth Avenue
      Portland, Oregon  97204

          Attorneys for Defendants

KING, Judge:

Pro se plaintiff Stephen Bishop alleges Due Process, Equal Protection, Eighth Amendment, and First Amendment claims against multiple prison officials concerning his four-month incarceration in Oregon prisons under an Interstate Corrections Compact with the Arizona Department of Corrections. Before the court are defendants' motions for summary judgment. For the reasons below, I grant defendants' motions and dismiss Bishop's claims.

## FACTS

Bishop was transferred from the Arizona Department of Corrections ("ADOC") to the Oregon Department of Corrections ("ODOC") on July 24, 2002. At first, he went to the intake center at Coffee Creek Correctional Facility ("CCCF") for processing. While there, Bishop spoke to several inmates who had been in Arizona prisons or who were Oregon or California gang members. They told him that all inmates from out-of-state were checked on. Fifteen years before, Bishop had reported contraband possessed in his prison by inmates belonging to the Aryan Brotherhood, a white supremacist gang. His report resulted in some convictions after rectal searches of 165 inmates. Because of this, Bishop was afraid he would be killed if he was housed in the general population. ADOC held Bishop in involuntary protective segregation status due to numerous incompatibility issues with other inmates.

On August 16, 2002, Bishop was transferred from CCCF to Two Rivers Correctional Institution ("TRCI"). TRCI has small and isolated housing units with increased staff supervision. Each housing unit has its own recreation yard, law library, and meal facility. The staff believed that Bishop could live there without interacting with any inmates he believed were a threat.

According to defendants, Bishop told ODOC officials that he spoke to inmates from Arizona while at CCCF but would not identify any of the inmates by name or physical description. Thus, ODOC could not identify the individuals who could have posed a threat to Bishop or the facilities in which they were incarcerated. Because Bishop could not identify that he was facing a specific threat, TRCI concluded that he did not qualify for Administrative Segregation Unit "(ASU)" and assigned him to a general population unit.

According to Bishop, he identified two Arizona inmates he saw at CCCF, one of whom corresponded with his former cell partner, a white supremacist. There is no evidence on where they were incarcerated after leaving CCCF.

The record contains letters and emails between ADOC, ODOC, and officials at the ODOC facilities. ADOC was trying to move Bishop from a Connecticut prison so he could serve out the remainder of his time closer to his family in northern California. ADOC also wanted to assign Bishop into a general population if possible. Both corrections departments, as well as officials at the ODOC facilities, understood the possible threat to Bishop. No members of the Aryan Brotherhood were housed at TRCI. TRCI was convinced that Bishop would be safe in one of its small general population units and was willing to immediately move Bishop to ASU if he reported an actual problem.

On the first day at TRCI, Bishop received a misconduct report from Sergeant Boman for refusing three direct orders to go to his general population unit. The report charged Bishop with violation of Rule 4A, Disobedience of an Order, and Rule 4L, Unauthorized Area. On August 20, 2002, Hearing Officer Clemente presided over the hearing.

Clemente found Bishop guilty of Disobedience of an Order I and sanctioned him to seven days in the Disciplinary Segregation Unit ("DSU") and fourteen days loss of privileges after release from DSU. During the entire time Bishop was at TRCI, he refused to leave DSU to go to a general population unit. This resulted in him getting a string of disciplinary reports which were all dismissed except the first for the reason that the order to leave DSU was not a valid order.

On his arrival at TRCI, Bishop's dental partial plate was taken from him for inspection. Because the upper plate had metal with sharp edges, Sergeant Bowman sent it to Health Service to be inspected and authorized, pursuant to standard procedure. The upper plate was returned to Bishop two weeks later. During the time Bishop did not have his upper plate, he could not eat foods that had to be chewed vigorously, such as meat, tortillas, and some vegetables. He states that he now has to use dental adhesive on the upper plate because his ridge changed when he was not wearing it and the plate no longer fits well. Bishop also states that his own front teeth were chipped during the time because his lower plate was not held in the proper position without the upper plate in place.

Dr. Putnam works as a dentist at TRCI. According to Dr. Putnam, patients normally go without a partial dental plate two to four weeks while it is being fitted and manufactured. If Bishop did not wear his upper plate for two weeks, Dr. Putnam believes that there possibly was minimal shifting of the remaining teeth but that the teeth would return to their proper positions

once the upper plate was replaced. When he examined Bishop on October 1, 2002, Bishop did not mention anything about problems with his upper plate. Dr. Putnam's records show that at this visit, Bishop requested dental adhesive and asked about his chipping teeth. The records note that Dr. Putnam explained the cause of the chipping to Bishop and which treatment could be done.

Inmates in the DSU are usually allowed to go to the DSU recreation yard for five days a week for 30 to 40 minutes each time. The inmate loses this privilege if they have a pending disciplinary hearing or have received a disciplinary sanction of loss of yard privileges. While at TRCI, Bishop was only allowed outdoor recreation one time in 74 days. This was because he had disciplinary hearings pending constantly for the consecutive misconduct reports filed against him.

Because of the cold temperature in his DSU cell, Bishop states that he was in extreme pain and agony from his arthritis during his entire stay at TRCI. Staff checked the cell temperature in DSU after receiving complaints from several inmates and found the temperature to be within an acceptable range. Bishop was given two wool blankets, the usual issue for an inmate. He had to make his bed with one of the blankets from 7:00 AM to 4:30 PM each day but could wrap himself in the second blanket during the day. Bishop was issued a cotton jumpsuit to wear plus either canvas shoes or shower shoes.

While at TRCI, Bishop states that he was held in a cell with a solid door and not allowed to talk to anyone other than staff. He was told that he could not yell out at other prisoners and could not talk to them while walking under escort.

On September 27, 2002, ODOC wrote ADOC asking that Bishop be returned to Arizona custody. ODOC stated, "This request is made because Inmate Bishop [has] not provided the appropriate information needed to place him in Administrative Segregation, he also, [sic] refused to go to general pop, and, thereby, remains in Disciplinary Segregation for disobeying orders." Zeh Aff. Att. 5. Bishop was returned to Arizona on October 30, 2002.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.    Bishop's Motion for Judgment by Default

Bishop asks me to enter a default judgment against all defendants except Clemente for failing to comply with discovery requests. Bishop sought records from his disciplinary cases. Defendants responded that in Disciplinary Case A0208-N194-N19, the records were purged after two years. All other cases were dismissed and the record purged, apparently immediately. Thus, defendants stated that they had no documents to produce. Bishop does not believe defendants because Clemente produced the report for A0208-N194-N19.

Defendants state that under ODOC policy, all disciplinary records are purged after two years. The latest that Bishop's record would have been purged is October 2004, two years after he returned to Arizona.

I take defendants at their word. The fact that Clemente was able to produce a copy of the records for one case does not mean that the other defendants have copies which they improperly failed to produce. A party is only required to produce documents "which are in the possession, custody or control of the party." Fed. R. Civ. P. 34(a). Accordingly, I deny Bishop's motion for judgment by default.

II.     Due Process

Bishop argues that the repeated discipline was "bogus" and violated his due process rights because defendants knew that he would be in danger if he went to the general population. Defendants argue that placement in DSU is not a protected liberty interest sufficient to trigger the Due Process Clause. Defendants also note that Bishop remained in DSU because he refused to leave, as he was ordered to do after each discipline was cleared.

Procedural due process requirements only apply to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. Board of Regents v. Roth, 408 U.S. 564, 569, 92 S. Ct. 2701 (1972). Liberty interests are limited to freedom from restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293 (1995).

> The Court in Sandin relied on three factors in determining that the plaintiff possessed no liberty interest in avoiding disciplinary segregation: (1) disciplinary segregation was essentially the same as discretionary forms of segregation; (2) a comparison between the plaintiff's confinement and conditions in the general

Page 7 - OPINION AND ORDER

population showed that the plaintiff suffered no major disruption in his environment; and (3) the length of the plaintiff's sentence was not affected.

Jackson v. Carey, 353 F.3d 750, 755 (9th Cir. 2003) (internal citation and quotation omitted).

I first note that Bishop was free to go the general population but refused to do so. Thus, the appropriate comparison is between DSU and ASU, where he wished to be housed. Bishop has submitted no record, however, on whether there is any difference between the conditions of confinement in those two units. See Sandin, 515 U.S. at 486 (no liberty interest created because "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody"). Thus, Bishop has failed to raise a factual issue on whether the difference, if one existed, is sufficient to meet the Sandin test for a liberty interest.

Although the revolving door of disciplinary hearings, as well as the lack of communication up front between ODOC and TRCI, do not appear to be an appropriate way to handle this situation, no due process violation occurred. I grant summary judgment against the Due Process Claim.

III.     Equal Protection

Bishop contends that as a transferee from another state, defendants treated him differently than Oregon prisoners who face a threat. He provides no evidence of this, however. Defendants provide evidence that all inmates, no matter where they are from, must provide evidence of the existence of an actual threat before being placed in ASU. Bishop has failed to raise a factual issue that defendants treated him differently than similarly situated prisoners from Oregon. I grant summary judgment against the claim.

Page 8 - OPINION AND ORDER

IV.   Eighth Amendment

Bishop contends that the lack of his dental plate for two weeks, the cold in his cell, and the denial of recreation time for 74 days violate the Eighth Amendment's prohibition against cruel and unusual punishment.

I will first address the lack of a dental plate.  Bishop contends that during the two week period, he could not eat food which required vigorous chewing and his teeth chipped.  Once he got the upper plate back, Bishop contends that he had to start wearing dental adhesive because the fit was no longer correct.

The Eighth Amendment is violated if prison officials are deliberately indifferent to a prisoner's serious medical needs.  Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004).

> To establish an Eighth Amendment violation, a prisoner must satisfy both the objective and subjective components of a two-part test.  First, there must be a demonstration that the prison official deprived the prisoner of the minimal civilized measure of life's necessities.  Second, a prisoner must demonstrate that the prison official acted with deliberate indifference in doing so.
>
> A prison official acts with deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety.  Under this standard, the prison official must not only be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, but that person must also draw the inference.  If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk.  This subjective approach focuses only on what a defendant's mental attitude actually was.  Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment Rights.

Id. (internal citation and quotation omitted).

A serious medical need exists if there is:  (1) an injury that a reasonable doctor or patient "would find important and worthy of comment or treatment"; (2) a medical condition that significantly affects an individual's daily activities; (3) chronic and substantial pain; or (4) a

Page 9 - OPINION AND ORDER

failure to treat that could result in further significant injury or the "unnecessary and wanton infliction of pain." Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000); Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). "[R]outine discomfort" resulting from incarceration and which is "part of the penalty that criminal offenders pay for their offenses against society" does not constitute a serious medical need under this standard. Doty, 37 F.3d at 546 (internal quotation omitted).

Dr. Putnam provides evidence that it is normal for a person to go without a partial dental plate for two to four weeks while it is being fit. Any shifting of the bite is corrected when the plate is reinserted. Bishop does not state that he was in substantial pain. Although he claims that he could not eat certain foods, he does not state that he was unable to properly nourish himself with softer foods during the period. See LeMaire v. Maas, 12 F.3d 1444, 1456 (9th Cir. 1993) (Eighth Amendment requires that prisons provide adequate food to maintain inmates' health). Moreover, Dr. Putnam examined Bishop after he got the upper plate back. The chart notes reflect that there were some chipped teeth but do not state the cause and do not state that the chips or upper plate were causing Bishop any difficulties. The dentist explained possible treatments to Bishop for the chipped teeth but no treatment plan was put in place. Bishop was provided with dental adhesive. I conclude that taking Bishop's upper plate for two weeks did not deprive him of the minimal civilized measure of life's necessities and did not create a serious medical need. I grant summary judgment against this portion of the Eighth Amendment claim.

I now turn to the temperature of Bishop's cell and the lack of recreation.

The treatment a prisoner receives in prison and the conditions of his confinement are subject to scrutiny under the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 31, 113

S. Ct. 2475 (1993). An Eighth Amendment claim must satisfy both an objective and subjective inquiry. Lopez, 203 F.3d at 1132-33. The objective inquiry requires a showing that the inmate has been deprived of the minimal civilized measure of life's necessities. The subjective inquiry requires a showing that correctional officials acted with deliberate indifference. Id. at 1133.

Bishop was given a jumpsuit and shoes to wear plus two wool blankets for sleeping. He had to make his bed with one of the blankets from 7:00 AM to 4:30 PM each day but could wrap himself in the other blanket during the day and both blankets after 4:30 PM. Bishop does not estimate the cell temperature. Defendants provide evidence that they measured the temperature after receiving complaints and concluded that it was within normal bounds.

The Eighth Amendment guarantees adequate heating. Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996) (allegation that average temperature in cell tended to be either well above or well below room temperature only suggests that the temperature was not comfortable and is insufficient to support Eighth Amendment claim), amended on denial of reh'g, 135 F.3d 1318 (1998). As in Keenan, Bishop has not provided enough information to raise a factual issue that the cell temperature was colder than being merely uncomfortable. There is no evidence that Bishop requested medical attention for the pain caused by the cold. Thus, he has failed to raise a factual issue that he was denied more than the minimal civilized measure of life's necessities. I grant summary judgment against this portion of the Eighth Amendment claim.

Bishop states that he was denied access to the exercise yard for all but one of 74 days during his confinement in the DSU. "Although exercise is one of the basic human necessities protected by the Eighth Amendment, a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." May v. Baldwin, 109 F.3d 557, 565 (9th Cir.), cert.

denied, 522 U.S. 921 (1997) (no Eighth Amendment violation for a 21 day stay without exercise) (internal citation and quotation omitted). Bishop does not state that he suffered any ill effects from the lack of exercise other than he believed he would have been warmer if he could have gone outside in the sun. He has failed to raise a factual issue that he suffered a substantial deprivation. I grant summary judgment against this portion of the Eight Amendment claim.

Accordingly, I grant summary judgment against all parts of Bishop's Eighth Amendment claim.

V.     First Amendment

Bishop contends that defendants violated his First Amendment right to freedom of speech when he was kept in DSU and could not interact with other inmates.

Prison First Amendment cases generally analyze whether prison regulations violate the right to free speech. See, e.g., Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254 (1987) (challenge to prison's regulations limiting correspondence to other inmates). Bishop is not complaining about a regulation. Instead, he complains of a consequence of his confinement in DSU. This is more properly dealt with in the Due Process claim discussed above. Defendants also correctly note that they attempted numerous times to move Bishop into the general population where he would have no restriction on communication with the other inmates in his unit. I grant summary judgment against the First Amendment claim.

///

///

Page 12 - OPINION AND ORDER

## CONCLUSION

Bishop's Motion for Judgment by Default (#77) is denied. Defendant Clement's Motion for Summary Judgment (#69) and Defendants' Motion for Summary Judgment (#73) are granted. This action is dismissed with prejudice.

IT IS SO ORDERED.

Dated this \_\_\_\_\_5th_____ day of September, 2007.

                                               /s/ Garr M. King
                                               Garr M. King
                                               United States District Judge